UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRANDON COOPER,<br><br>                                Plaintiff,<br><br>                -against-<br><br>THE OFFICE OF THE COMMISSIONER OF BASEBALL d/b/a MAJOR LEAGUE BASEBALL, and PDL BLUE, INC.,<br><br>                                Defendants. | Civil Case No.:  24-cv-3118<br><br>**<u>COMPLAINT</u>**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff BRANDON COOPER ("Plaintiff" or "Mr. Cooper"), by and through his attorneys, JOSEPH & NORINSBERG, LLC, as and for his Complaint against THE OFFICE OF THE COMMISSIONER OF BASEBALL d/b/a MAJOR LEAGUE BASEBALL ("MLB") and PDL BLUE INC. ("PDL") (collectively, "the League" or "Defendants"), alleges upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

**<u>NATURE OF THE CASE</u>**

1.      This is a civil action for damages and equitable relief based upon willful violations that Defendants committed of Plaintiff's rights guaranteed to him by: (i) the anti-sexual harassment, hostile work environment, anti-gender discrimination, and anti-retaliation provisions under the New York State Human Rights Law ("NYSHRL"); (ii) the anti-sexual harassment, hostile work environment, anti-gender discrimination, and anti-retaliation provisions and the New

York City Human Rights Law ("NYCHRL"); and (iii) and any other violations that can be inferred from the facts set forth herein.[1]

## PRELIMINARY STATEMENT

2.      Landing an umpire job with the MLB was a dream come true for Mr. Cooper.  That dream quickly became a nightmare when Mr. Cooper was repeatedly subjected to dehumanizing homophobic slurs such as, "**Faggot**" "**Don't be a bitch**" **and "Gay,"** and then ultimately terminated by the League because of his gender and sexual orientation.

3.      Historically the MLB has had a homogenous roster of umpires working in both the Minor and Major Leagues.  Specifically, to date there has never been a woman who has worked in a season game played in the Majors, and most umpires are still Caucasian men.  To try to fix its gender and racial diversity issue, Defendants have implemented an illegal diversity quota requiring that women be promoted regardless of merit.

4.      Unfortunately, this open diversity quota emboldened Mr. Cooper's harasser - - Gina Quartararo ("Gina") - - who knew she could harass Mr. Cooper with impunity and get him fired and she had no qualms about boasting: **"I'm a woman and can get away with anything"** and the **"MLB has to hire females, they won't get rid of me unless I quit."**

5.      True to her threats, despite colleagues and Mr. Cooper raising concerns with human resources about Gina's harassment, Defendants disciplined Mr. Cooper instead.

6.      Worse still, Defendants unlawfully terminated Mr. Cooper's employment - - despite his qualifications - - in favor of promoting Gina who openly and vociferously harassed him and others.

---

[1] On April 22, 2024, Plaintiff also filed a Charge with the Equal Employment Opportunity Commission ("EEOC") with the same allegations but under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-17. Plaintiff intends to amend his complaint to include his federal claims once he receives a right to sue letter from the EEOC.

7.     Ultimately, in terminating Mr. Cooper's employment, Defendants ignored and condoned hateful and bigoted speech that illegally targeted Mr. Cooper based on his sexual orientation and gender in favor of an illegal diversity quota that egregiously violated Mr. Cooper's civil rights.

## JURISDICTION AND VENUE

8.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332.

9.     This Court has jurisdiction over the parties by reason of diversity of citizenship between Plaintiff Brandon Cooper, who is a resident and citizen of Ohio, and Defendant MLB is an unincorporated entity with its principal place of business in New York, PDL is incorporated in Delaware with its principal places of business in New York, and the amount in controversy, exceeds $75,000.00.

10.     Venue is appropriate in this court pursuant to 28 U.S.C. § 1391(b)(1) as one or more of the Defendants reside within this judicial district.

## PARTIES

11.     At all relevant times, Plaintiff worked for Defendants and was an "employee" entitled to the protections as defined by the NYSHRL and the NYCHRL.

12.     The Office of the Commissioner of Baseball is an unincorporated association that does business as Major League Baseball, with its principal place of business located at 1271 Avenue of the Americas, New York, New York 10020.

13.     PDL Blue Inc. is a foreign corporation organized under the laws of Delaware, with its principal place of business located at 1271 Avenue of the Americas, New York, New York 10020.

14.     At all relevant times, Defendants were "employers" within the meaning of the NYSHRL and the NYCHRL.

**BACKGROUND FACTS**

**Mr. Cooper had a Promising Career as an Umpire**

15.     In May 2022, Plaintiff attended an all-day MLB Umpire Camp in Indianapolis, Indiana to compete for a chance to enter the MLB umpire training program.

16.     On May 27, 2022, Plaintiff received a call from Tyler Funneman ("Funneman"), an Umpire Development Supervisor, and Cris Jones, Head Supervisor, who informed Mr. Cooper that he had performed well and showed real promise at the Indianapolis Camp and that they would be in touch in a few months after they had conducted some additional one-day camps.

17.     On October 4, 2022, Funneman and Jones called Mr. Cooper again and invited him to attend the MLB Umpire Prospect Development Camp ("PDC") in Vero Beach, Florida. Funneman and Jones told Plaintiff he had tremendous potential and that they anticipated that he would advance in the Minor League ranks quickly and eventually be a Major League umpire. Funneman subsequently emailed Mr. Cooper a confirmation, "We are excited to have you join us in January."

18.     On January 3, 2023, Plaintiff began the all-expenses four-week course at the PDC in Vero Beach, Florida.  Mr. Cooper excelled at the PDC, scoring a 95% on his online testing and was often used as a positive example by MLB Baseball Development Staff to other candidates on how they should be performing while in training.

19.     At the end of the four-week course at the PDC, Plaintiff was invited to attend Spring Training in Florida from March 13, 2023 through April 2, 2023. This invitation offered Plaintiff a chance to compete for a full-time job as an umpire in Minor League Baseball, which is where all umpires start their professional careers in the MLB.

20.     Plaintiff was honored and excited to be invited to Spring Training as he was only 19 out of 52 in his class to receive an invitation and move on in the process of becoming an umpire.

21.     However, when he was invited to Spring Training, Mr. Cooper was put on the "taxi squad," which was deemed a part-time position that was comprised of only white males, including Mr. Cooper. The Director of Umpire Training, Dusty Dellinger ("Dellinger"), informed Mr. Cooper and the others that the M.LB required women and minority candidates to be hired first, and so the taxi squad would need to be placed on full-time status later.  The MLB's discriminatory rationale was further confirmed by other full time umpire trainers who informed Mr. Cooper and the others on the taxi squad that they had not been hired to full time status because they "didn't meet the diversity quota."

22.     Throughout March 2023, while at Spring Training, Plaintiff proved himself time and time again as a candidate with promise and by mid-March had received stellar evaluations from both Dellinger and his crew chief.

23.     Ultimately, on March 24, 2023, Plaintiff was only one of six in his cohort that Defendants promoted to work in the Arizona Complex League on a full-time basis as a Minor League Umpire.  Mr. Cooper received a congratulatory call from Supervisor Jorge Bausa.

24.     Moreover, on June 27, 2023, Mr. Cooper received, what would be, his last evaluation from Jim Reynolds which rated Mr. Cooper highly as "meeting" the MLB's standards in most of the categories, except that he was "above" for his focus, professionalism / field presence, and "superior" in his pacing of the game.

25.     By all accounts, Plaintiff was on his way to successfully making it in the MLB based on his merits.

**Defendants' Unlawful Quota-Based Diversity Initiative**

26.     As far back as 2013, the MLB recognized that it had a "diversity issue" because, at the time, only seven percent of the MLB's Major League umpires were minorities. *See Hernandez v. Office of the Comm'r of Baseball*, 2021 U.S. Dist. LEXIS 62700, at 24-25 (S.D.N.Y. Mar. 31, 2021).

27.     Defendants' gender diversity in the majors is even worse, as Defendants have yet to assign a woman to umpire a regular-season game in the majors. On February 25, 2024, it was the first time in seventeen years that Defendants had a woman umpire a major league spring training game. The MLB trails behind other professional sports in its efforts to break gender barriers for women as the move to add women to the majors comes twenty-seven years after the NBA added women umpires, nine years after the NFL, and two years after the World Cup.[2]

28.     To remedy its gender and minority diversity gap issues, Defendants have developed an unlawful quota system to increase its women and non-white male umpires into the MLB.

29.     This diversity quota was common knowledge. and on multiple occasions during Mr. Cooper's first session in January 2023, supervisors Ed Rapuano ("Rapuano") and Darren Spagnardi ("Spagnardi"), blatantly stated that the MLB had to hire at least two women, i.e. 20%

---

[2]  https://www.espn.com/mlb/story/_/id/39593154/jen-pawol-becomes-first-woman-umpire-spring-game-2007 (last visited April 12, 2024).

of the new hires, to satisfy MLB's "diversity" quota, regardless of the candidates' actual qualifications or merits as compared to the male candidates.  Further, Rapuano and Spagnardi complained to Mr. Cooper about the diversity requirement after one of the women who had been chosen to over the "taxi squad" had been repeatedly making mistakes day-after-day during drills at the camp.

30.     Later, while working in Arizona, Dellinger, tried to recruit a fellow umpire's sister to try out as an umpire despite her lack of experience or interest, "because the MLB needed more female umpires."

31.     Moreover, on or about May 23, 2023, during a game at which Jason Starkovich ("Starkovich") was evaluating Mr. Cooper and the other umpires working that day, discussed some of the problems he was seeing with the performance of, Liana Rix, who was one of the women directly hired from the PDC.  Specifically, Mr. Cooper and Starkovich discussed her difficulties with being able to "track the ball off the bat" and Starkovich noted that "she seemed lost back there . . . but we had to hire her [for diversity reasons]."

### *Mr. Cooper is Subjected to a Hostile Work Environment*

32.     Things took a turn for the worse for Mr. Cooper on or about June 3, 2023, when Gina transferred to Arizona and began working alongside Mr. Cooper as a full-time umpire.  From her very first day in Arizona, Gina began her campaign of harassment, making sexually suggestive comments, homophobic slurs, and gendered threats against Mr. Cooper.

33.     For example, on her night of arrival, during a gathering in Mr. Cooper's room attended by Kevin Bruno ("Bruno"), Alex Shears, Jonathon Rector ("Rector") and Stone Carver, Gina became belligerent and disturbingly boasted, ***"I can have sex with any of you and nothing***

would happen," "I can fuck anyone in this hotel," "I'm a woman, I can get away with anything" and "I'm a female and they will believe me over a male."

34.     Emboldened by the MLB's unlawful diversity quota, Gina proclaimed, "MLB has to hire females [and] they won't get rid of me unless I quit" and "I'm going to be in the hall of fame as the first female in the MLB."   In her final aggressive act that evening, Gina set her sights on Mr. Cooper, who was laying in his hotel bed with another umpire, Bruno, watching Netflix, and began calling them both "gay" and "faggots" for watching Netflix together.

35.     Unfortunately, June 3, 2023, was just a warm-up for Gina, whose obsession with Mr. Cooper's sexuality and having sex was relentless. Indeed, Gina inappropriately asked Mr. Cooper if he was "still cuddling Bruno," and continued to routinely call him a "faggot."

36.      No place was safe from her attacks, because even at work outings, Gina attempted to humiliate Mr. Cooper in front of complete strangers, telling them that Mr. Cooper and his colleagues, "all have small dicks" and not to "sleep with them because they're all gay for each other." When Mr. Cooper asked Gina to stop calling him a faggot and reminded her that he is bisexual and did not want to be outed, she doubled down, and told him to "stop being a bitch" and "don't be so sensitive."

37.     Things reached a fever pitch on late July 4th, into the early morning on July 5, 2023. Mr. Cooper and several other colleagues - - Stone Garver, Michael Cross, and Bruno - - went to Mr. Cooper's room and accidentally walked in on Gina and his roommate Rector heavily making out in Mr. Cooper's room. In response, Gina shoved Rector off of the bed and Mr. Cooper immediately closed the door.

38.     Later, Gina told Mr. Cooper and his colleagues that she planned to accuse Rector of sexual assault to avoid being disciplined for their fraternization, and that "she could get away with it" because of her gender.  After Mr. Cooper and his colleagues challenged Gina's plan to heinously lie about Rector, she became belligerent and blamed Mr. Cooper and his colleagues for walking in on them and claimed that she could **"fuck anybody in this hotel if I want to."**

39.     Concerned that Mr. Cooper and his colleagues would report her egregious conduct, Gina threatened that she would "**slit [their] throats and suck [their] blood. . . you're a bunch of faggots**" if they told anyone what had happened that evening.

40.     When verbal threats did not feel sufficient, Gina then became physical with Mr. Cooper, pushing his chest, and locking him out of his own room.  Once Mr. Cooper gained access to his room, Gina shoved Mr. Cooper into the wall and told him to "**shut the fuck up**." In an effort to deescalate the situation, Mr. Cooper asked Gina to stop touching him and to leave his room so he could go to sleep, which she eventually did.

41.     Concerned by what had occurred, Mr. Cooper and Bruno consulted with some of the higher-level umpires who instructed them to report the incident, in part, because Rector had made several suicidal statements that night over concern that he would lose his job as an umpire for making out with Gina.

42.     On or about July 6, 2023, after consulting Mr. Cooper, Cross and Stone, Bruno submitted a written complaint describing the July 4-5 incidents in great detail to Dellinger.  Bruno's report explained in explicit detail how Gina had used incendiary language, such as "Faggot" and repeated rants about being untouchable at the MLB because of her gender.

43.     Later that day, after receiving a call from a union attorney, Gina texted Rector to inform him that she was "done with [Mr. Cooper]" and that she planned "to get rid of him," believing that he had been the one that "snitched" on her.

***Defendants Unlawfully Retaliate and Terminate Plaintiff Because of his Gender and Sexual Orientation***

44.     Shockingly, in response to Bruno's complaint to the MLB about Gina's unlawful and deplorable conduct, the MLB informed Mr. Cooper that he would have to under sensitivity training and refused to explain what he had done to warrant such training.

45.     Not understanding why he was being punished for Gina's abhorrent conduct, on or about July 22, 2023, Mr. Cooper called President Jordan Ferrell ("Ferrell") to explore his options and find out why he was being punished.  In response, Ferrell threatened Mr. Cooper that if he asked questions, he would be suspended for three games without pay. Additionally, despite not being the aggressor or wrongdoer in this incident, Mr. Cooper learned that this incident would disturbingly go in his personnel file with the MLB and hurt his chances of promotion down the line.

46.     Then on July 24th, Jordan followed up via text message, making it abundantly clear that the MLB would punish him if he complained, stating, "I spoke to MLB. They are enticing you to not do an interview and ask them questions."

47.     Shortly after receiving this text message, Mr. Cooper received an email from the MLB stating that he was being accused (and not Gina) of violating the Anti-Discrimination and Harassment Policy for Minor Leagues ("Policy").

48.     Mr. Cooper subsequently met with Billy Bean ("Bean"), from Human Resources, who interviewed Mr. Cooper to determine if he had indeed violated the Policy.  Bean explained that when he was in the process of interviewing Gina, she had accused Mr. Cooper of being a "mean person" and that she had been victimized as the sole female umpire working in Arizona.

49.     Mr. Cooper pointed out that this was blatantly false given that there were two other women working as umpires alongside Gina in Arizona.  Mr. Cooper then complained to Bean of Gina's egregious homophobic conduct and weaponizing her gender - - despite Jordan's warnings - - and disclosed that there were multiple videos taken by Stone, Cross and Mr. Cooper of the Gina's conduct, in fear that Gina had put her hands on Mr. Cooper twice and had threatened all the men that she was untouchable. Mr. Cooper further told Bean that he was concerned that his assertions that Gina had gotten physical with him were not being taken seriously by Human Resources or the MLB.  In response, Bean brushed Mr. Cooper's concerns off and informed Mr. Cooper that he wanted the situation to be a "learning experience _**for everyone**_" and that he would further investigate the issue and provide him with an update thereafter.

50.     Despite providing witnesses and informing him that he and others had documentation, Bean never requested Mr. Cooper's documentation and failed to interview any of Mr. Cooper's witnesses or collect their documentation of Gina's conduct.  Instead, when informed that there was video documentation, that Gina had threatened to get Mr. Cooper terminated, and that Gina believed she was untouchable because of her gender, Bean simply instructed Mr. Cooper to hold onto to his video recordings.

51.     Instead of thoroughly investigating Mr. Cooper's allegations of discrimination, Defendants set their sights on getting rid of Mr. Cooper and stopped evaluating his performance and excluded him from the playoffs, clearly to lay the groundwork for ousting him from the MLB.

Indeed, Mr. Cooper was entitled to at least four (4) evaluations during his season, by at least two different evaluators. For the one evaluation that Mr. Cooper did have in June 2023, he received very high marks, and received, "met", "above" or "superior" in each category.

52.     In a final act of discrimination and retaliation, in a phone call with Dellinger and Spagnardi that lasted less than a minute, Defendants terminated Mr. Cooper from his contract without explanation, ending his promising career as an umpire in the League in early October 2023.

53.     The MLB's termination of Mr. Cooper was clearly a further act of its unlawful gender diversity quota and illegal retaliation, and in no way legitimate, given Mr. Cooper's high-performance ratings.

54.     Of note, Mr. Cooper was the sole first year umpire fired out of the twenty-six original umpires hired in Mr. Cooper's cohort. To date, Gina is still employed with the MLB.

55.     Moreover, the League's wrongful termination further robbed Mr. Cooper of working in the Minor and Major Leagues in New York.  Thus, had Defendants not unlawfully terminated Mr. Cooper, Mr. Cooper would have worked in New York and New York City as a Major League umpire, and would have earned substantial income throughout his career. As a result of Defendants' unlawful actions, Plaintiff's dream of becoming a Major League umpire has been permanently derailed.[3]

---

[3] The MLB's derailment of Mr. Cooper's promising career has not only robbed him of career fulfillment, but also an earning potential of between $150,000.00 to up to $500,000.00, as well as per diem pay, free hotels, and first class airfare.
*See* https://www.sportingnews.com/us/mlb/news/world-series-umpire-salaries-mlb-2023 games/25a8f1990592469f3333313e#:~:text=According%20to%20Career%20Trend%2C%20MLB,year% 2C%20depending%20on%20their%20seniority ( last visited April 17, 2024).

**FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS**
**(Hostile Work Environment Because of Gender and**
**Sexual Orientation in Violation of the NYSHRL)**

56.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

57.     The NYSHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's sex, gender and/or sexual orientation.

58.     As described above, Plaintiff was subjected to a hostile work environment because of his gender or sexual orientation.

59.     As a direct and proximate result of Defendant's conduct in violation of the NYSHRL Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

**SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS**
**(Wrongful termination and/or Retaliation in Violation of the NYSHRL)**

60.     Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

61.     The NYSHRL prohibits employers from terminating employees because of their gender and sexual orientation.

62.     The NYSHRL prohibits employers from retaliating against employees who engage in activity protected by the NSYHRL.

63.     As described above, Defendants unlawfully terminated Plaintiff because of his gender or sexual orientation in violation of the NYSHRL.

64.     As set forth above, Plaintiff was an employee who engaged in activity protected under the NYSHRL, while Defendants are employers within the meaning of the NYSHRL.

65.     After Plaintiff engaged in activity protected under the NYSHRL, Defendants retaliated against Plaintiff as also described above.

66.     As a direct and proximate result of Defendant's unlawful termination and/or retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered economic loss, and continues to suffer, for which he entitled to an award of monetary damages.

67.     As a direct and proximate result of Defendants' conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
**(Hostile Work Environment Because of Gender and
Sexual Orientation in Violation of the NYCHRL)**

68.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

69.     The NYCHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's sex, gender and/or sexual orientation.

70.     As described above, Plaintiff was subjected to a hostile work environment because of his gender or sexual orientation.

71.     As a direct and proximate result of Defendant's conduct in violation of the NYCHRL Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety,

loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

### FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
**(Wrongful Termination and/or Retaliation in Violation of the NYCHRL)**

72.     Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

73.     The NYCHRL prohibits employers from terminating employees because of their gender and sexual orientation.

74.     The NYCHRL prohibits employers from retaliating against employees who engage in activity protected by the NYCHRL.

75.     As described above, Defendants unlawfully terminated Plaintiff because of his gender or sexual orientation in violation of the NYCHRL.

76.     As set forth above, Plaintiff was an employee who engaged in activity protected under the NYCHRL, while Defendants are employers within the meaning of the NYCHRL.

77.     After Plaintiff engaged in activity protected under the NYCHRL, Defendants retaliated against Plaintiff as also described above.

78.     As a direct and proximate result of Defendant's unlawful termination and/or retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered economic loss, and continues to suffer, for which he entitled to an award of monetary damages.

79.     As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## DEMAND FOR A JURY TRIAL

80.     Pursuant to FRCP 38(b), Plaintiff demands a trial by jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.      A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned New York State laws;

b.      Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c.      An order restraining Defendants from any retaliation against Plaintiff or witnesses for participating in this lawsuit in any form;

d.      Granting an award of damages in an amount to be determined at trial to compensate Plaintiff for all monetary and/or economic damages in connection with his claims, whether legal or equitable in nature, including back pay, reinstatement or front pay, and any other damages for lost compensation or employee benefits that he would have received but for Defendant's unlawful conduct;

e.      Granting an award of damages to be determined at trial to compensate Plaintiff for emotional distress and/or mental anguish in connection with his claims;

f.      Granting an award of damages to be determined at trial to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment in connection with his claims;

g.      Granting an award of punitive damages, to the extent permitted by law, commensurate with Defendants' ability to pay;

h.      Granting an award of reasonable attorneys' fees, as well as all costs and disbursements incurred in connection with this action, including expert witness fees and other costs;

i.      Granting an award of pre-judgment and post-judgment interest, as provided by law; and

j.      Granting such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        April 24, 2024

                            Respectfully submitted,

                            **JOSEPH & NORINSBERG, LLC**

                    By:     _____
                            JON L. NORINSBERG, ESQ. (JN 2133)
                            BENNITTA L. JOSEPH, ESQ. (BJ 1064)
                            CAITLIN DUFFY, ESQ. (CD 8160)
                            110 East 59th Street, Suite 2300
                            New York, New York 10022
                            Tel.: (212) 227-5700
                            Fax: (212) 656-1889
                            *Attorneys for Plaintiff*