# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRANDON COOPER and ALEXANDER LAWRIE,<br><br>                              Plaintiffs,<br><br>                    -against-<br><br>THE OFFICE OF THE COMMISSIONER OF BASEBALL d/b/a MAJOR LEAGUE BASEBALL, and PDL BLUE, INC.,<br><br>                              Defendants. | Civil Case No.:  24-cv-3118<br><br>**<u>AMENDED COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs BRANDON COOPER ("Mr. Cooper") and ALEXANDER LAWRIE ("Mr. Lawrie") (collectively, "Plaintiffs"), by and through their attorneys, JOSEPH & NORINSBERG, LLC, as and for their Amended Complaint against THE OFFICE OF THE COMMISSIONER OF BASEBALL d/b/a MAJOR LEAGUE BASEBALL ("MLB") and PDL BLUE INC. ("PDL") (collectively, "the League" or "Defendants"), allege upon knowledge as to themselves and their own actions, and upon information and belief as to all other matters, as follows:

## <u>NATURE OF THE CASE</u>

1.      This is a civil action for damages and equitable relief based upon willful violations that Defendants committed of Plaintiffs' rights guaranteed to them by: (i) the anti-sexual harassment, hostile work environment, anti-gender discrimination, and anti-retaliation provisions under the New York State Human Rights Law ("NYSHRL"); (ii) the anti-sexual harassment, hostile work environment, anti-gender discrimination, and anti-retaliation provisions and the New York City Human Rights Law ("NYCHRL"); (iii) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-17 ("Title VII"); and (iv) any other violations that can be inferred from the facts set forth herein

## PRELIMINARY STATEMENT

2.  Landing an umpire job with the MLB was a dream come true for the Plaintiffs. That dream quickly became a nightmare when Mr. Cooper was repeatedly subjected to dehumanizing homophobic slurs such as, "**Faggot" "Don't be a bitch" and "Gay,"** and then ultimately terminated by the League because of his gender and sexual orientation.

3.  For Mr. Lawrie, the nightmare began when he was sexually assaulted and harassed by Gina Quartararo ("Gina") on March 17, 2024. Specifically, while trapped in the backseat with Gina in a moving vehicle, Mr. Lawrie was forced to fend off Gina's unwelcomed advances towards him that ultimately culminated in her grabbing his genitals. Making matters even worse, after this horrifying event, Defendants terminated Mr. Lawrie because of his gender and in retaliation for complaining about Gina's abhorrent behavior.

4.  Historically the MLB has had a homogenous roster of umpires working in both the Minor and Major Leagues. Specifically, to date there has never been a woman who has worked in a season game played in the Majors, and most umpires are still Caucasian men. To try to fix its gender and racial diversity issue, Defendants have implemented an illegal diversity quota requiring that women be promoted regardless of merit.

5.  Unfortunately, this open diversity quota emboldened Gina, who knew she could harass Plaintiffs with impunity and get them fired. She had no qualms about boasting: **"I'm a woman and can get away with anything"** and the **"MLB has to hire females, they won't get rid of me unless I quit."**

6.  In or around Late April 2024, and after the MLB terminated Mr. Cooper and Mr. Lawrie, Gina boldly bragged and threatened a group consisting of other umpires (including Josh

Gallant) that, ***"If you guys bring it forward to [the]MLB I'll get you fired like I did the last two fucking guys"***.

7.      True to her threats, despite colleagues and Plaintiffs raising concerns with human resources and their union about Gina's harassment, Defendants disciplined Plaintiffs instead.

8.      Worse still, Defendants unlawfully terminated Plaintiffs' employment - - despite their qualifications - - in favor of promoting Gina who openly and vociferously harassed them and others.

9.      Ultimately, in terminating Plaintiffs' employment, Defendants ignored and condoned hateful and bigoted speech that illegally targeted Mr. Cooper based on his sexual orientation and gender, and they condoned the sexual assault of Mr. Lawrie. They did this in support of an illegal diversity quota that egregiously violated Plaintiffs' civil rights.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.      On July 9, 2024, Plaintiff Cooper filed a Charge of Discrimination ("Charge") with the United States Equal Employment Opportunity Commission ("EEOC"), EEOC Charge Nos. 520-2024-04649; 520-2024-04650, against Defendants based on gender and sexual orientation discrimination in violation of Title VII.

11.      On July 11, 2024, the EEOC issued Plaintiff Cooper a "Notice of Right to Sue." Plaintiff has amended his complaint within ninety days of receipt of that notice from the EEOC.

12.      On September 26, 2024, Plaintiff Lawrie filed a Charge of Discrimination ("Charge") with the United States Equal Employment Opportunity Commission ("EEOC"), against Defendants based on gender and sexual orientation discrimination in violation of Title VII, and simultaneously requested a right to sue.

## JURISDICTION AND VENUE

13.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332.

14.     This Court has jurisdiction over the parties by reason of diversity of citizenship between Plaintiff Brandon Cooper, who is a resident and citizen of Ohio; Plaintiff Alex Lawrie, who is a resident and citizen of Nova Scotia, Canada; Defendant MLB, who is an unincorporated entity with its principal place of business in New York; and Defendant PDL, who is incorporated in Delaware with its principal places of business in New York, and the amount in controversy, exceeds $75,000.00.

15.     Venue is appropriate in this court pursuant to 28 U.S.C. § 1391(b)(1) as one or more of the Defendants reside within this judicial district.

## PARTIES

16.     At all relevant times, Plaintiffs worked for Defendants and were "employees" entitled to the protections as defined by the NYSHRL, NYCHRL, and Title VII.

17.     The Office of the Commissioner of Baseball is an unincorporated association that does business as Major League Baseball, with its principal place of business located at 1271 Avenue of the Americas, New York, New York 10020.

18.     PDL Blue Inc. is a foreign corporation organized under the laws of Delaware, with its principal place of business located at 1271 Avenue of the Americas, New York, New York 10020.

19.     At all relevant times, Defendants were "employers" within the meaning of the NYSHRL, NYCHRL, and Title VII.

## BACKGROUND FACTS

### *The Longest Job Interview*

20.     Getting to become a major league umpire takes dedication and years of perseverance. The first step to becoming a major league umpire is to attend an MLB Umpire Camp, where candidates are observed and taught by MLB's Umpire Supervisory Staff. If successful, a candidate will be invited to the four-week course at the MLB Umpire Prospect Development Camp ("PDC") held in January each year.  At the PDC, each candidate is evaluated, and those that make it through will be offered positions into the Minor League Baseball, where an umpire begins their professional career.

21.     There are five levels in Minor League Baseball. The beginning level is called the Rookie/Complex League, followed by the Low A League, the High A League, the AA League, and then at the top of the ranks is the AAA League. As umpires develop and demonstrate their abilities they are promoted up through the ranks.  Once an umpire makes it to the AAA level, they can be considered for promotion to the Major Leagues. "It can often take around seven to ten years to advance through the ranks to the Majors,"[2] which is why some refer to it as the "the longest job interview."

### *Umpires Travel and work in Different States, Including New York, as they Work up the Ranks*

22.     A typical umpire's season runs from Spring Training in March through the end of the regular season, which is mid-September for Minor League umpires and October for Major League umpires.

---

[2]    The 5 Keys to becoming a Major League Umpire, MLB.Com (available at https://www.mlb.com/news/major-league-baseball-umpire-selection-process?msockid=13c0cf63877860431bdbddb2868561ef (last visited September 30, 2024).

23.    To ensure that umpires are not biased to a particular team, Defendants rotate umpires and assign them to different leagues as they move up the ranks and have them travel throughout the season to officiate different games.

24.    Once an umpire makes it to the High A level, they will be expected to work within its three leagues, which are the Midwest League, South Atlantic League, and the Northwest League.  The South Atlantic League is comprised of twelve teams, including the Brooklyn Cyclones and the Hudson Valley Renegades.  Thus, an umpire in the High-A level, will be expected to work, and will work, in Brooklyn and Fishkill New York, where each team is located.

25.    When an umpire advances to the AA level, that umpire will eventually work in the Eastern League and officiate games in Binghamton, New York where the Binghamton Rumble Ponies play.

26.     Likewise, when an umpire advances to the AAA level, that umpire will be expected to work and will work, in Buffalo, Rochester, and Syracuse, to officiate games played by the Buffalo Bisons, Rochester Red Wings, and the Syracuse Mets.

27.    Once an umpire makes it to the Majors, Defendants make sure to rotate umpire crews around the league to avoid players having grudges against them based on the same teams seeing the same umpires all the time. Thus, Major League umpires are expected to work and will work, in the Bronx and Queens, New York throughout their career to officiate games played by the New York Yankees and the New York Mets, respectively.

### *Plaintiff Brandon Cooper*

### Mr. Cooper had a Promising Career as an Umpire

28.    In May 2022, Mr. Cooper attended an all-day MLB Umpire Camp in Indianapolis, Indiana to compete for a chance to enter the MLB umpire training program.

29.     On May 27, 2022, Mr. Cooper received a call from Tyler Funneman ("Funneman"), an Umpire Development Supervisor, and Cris Jones, Head Supervisor, who informed Mr. Cooper that he had performed well and showed real promise at the Indianapolis Camp and that they would be in touch in a few months after they had conducted some additional one-day camps.

30.     On October 4, 2022, Funneman and Jones called Mr. Cooper again and invited him to attend the PDC in Vero Beach, Florida.  Funneman and Jones told Plaintiff he had tremendous potential and that they anticipated that he would advance in the Minor League ranks quickly and eventually be a Major League umpire.  Funneman subsequently emailed Mr. Cooper a confirmation, "We are excited to have you join us in January."

31.     On January 3, 2023, Mr. Cooper began the all-expenses four-week course at the PDC in Vero Beach, Florida.  Mr. Cooper excelled at the PDC, scoring a 95% on his online testing and was often used as a positive example by MLB Baseball Development Staff to other candidates on how they should be performing while in training.

32.      At the end of the four-week course at the PDC, Plaintiff was invited to attend Spring Training in Florida from March 13, 2023 through April 2, 2023. This invitation offered Plaintiff a chance to compete for a full-time job as an umpire in Minor League Baseball, which is where all umpires start their professional careers in the MLB.

33.     Plaintiff was honored and excited to be invited to Spring Training as he was only 19 out of 52 in his class to receive an invitation and move on in the process of becoming an umpire.

34.     However, when he was invited to Spring Training, Mr. Cooper was put on the "taxi squad," which was deemed a part-time position that was comprised of only white males, including Mr. Cooper. The Director of Umpire Training, Dusty Dellinger ("Dellinger"), informed Mr. Cooper and the others that the M.LB required women and minority candidates to be hired first,

and so the taxi squad would need to be placed on full-time status later. The MLB's discriminatory rationale was further confirmed by other full time umpire instructors who informed Mr. Cooper and the others on the taxi squad that they had not been hired to full time status because they "didn't meet the diversity quota."

35.    Throughout March 2023, while at Spring Training, Plaintiff proved himself time and time again as a candidate with promise and by mid-March had received stellar evaluations from both Dellinger and his crew chief.

36.    Ultimately, on March 24, 2023, Mr. Cooper was only one of six in his cohort that Defendants promoted to work in the Arizona Complex League on a full-time basis as a Minor League Umpire. Mr. Cooper received a congratulatory call from Supervisor Jorge Bausa.

37.    Moreover, on June 27, 2023, Mr. Cooper received, what would be, his last evaluation from Jim Reynolds which rated Mr. Cooper highly as "meeting" the MLB's standards in most of the categories, except that he was "above" for his focus, professionalism / field presence, and "superior" in his pacing of the game.

38.    By all accounts, Mr. Cooper was on his way to successfully making it in the MLB based on his merits.

**Defendants' Unlawful Quota-Based Diversity Initiative**

39.    As far back as 2013, the MLB recognized that it had a "diversity issue" because, at the time, only seven percent of the MLB's Major League umpires were minorities. *See Hernandez v. Office of the Comm'r of Baseball*, 2021 U.S. Dist. LEXIS 62700, at 24-25 (S.D.N.Y. Mar. 31, 2021).

40.    Defendants' gender diversity in the majors is even worse, as Defendants have yet to assign a woman to umpire a regular-season game in the majors. On February 25, 2024, it was

the first time in seventeen years that Defendants had a woman umpire a major league spring training game. The MLB trails behind other professional sports in its efforts to break gender barriers for women as the move to add women to the majors comes twenty-seven years after the NBA added women umpires, nine years after the NFL, and two years after the World Cup.[3]

41.    To remedy its gender and minority diversity gap issues, Defendants have developed an unlawful quota system to increase its women and non-white male umpires into the MLB.

42.    This diversity quota was common knowledge. and on multiple occasions during Mr. Cooper's first session in January 2023, supervisors Ed Rapuano ("Rapuano") and Darren Spagnardi ("Spagnardi"), blatantly stated that the MLB had to hire at least two women, i.e. 20% of the new hires, to satisfy MLB's "diversity" quota, regardless of the candidates' actual qualifications or merits as compared to the male candidates.  Further, Rapuano and Spagnardi complained to Mr. Cooper about the diversity requirement after one of the women who had been chosen to over the "taxi squad" had been repeatedly making mistakes day-after-day during drills at the camp.

43.    Later, while working in Arizona, Dellinger, tried to recruit a fellow umpire's sister to try out as an umpire despite her lack of experience or interest, "because the MLB needed more female umpires."

44.    Moreover, on or about May 23, 2023, during a game at which Jason Starkovich ("Starkovich") was evaluating Mr. Cooper and the other umpires working that day, discussed some of the problems he was seeing with the performance of, Liana Rix, who was one of the women directly hired from the PDC.  Specifically, Mr. Cooper and Starkovich discussed her difficulties

---

[3]  https://www.espn.com/mlb/story/_/id/39593154/jen-pawol-becomes-first-woman-umpire-spring-game-2007 (last visited April 12, 2024).

with being able to "track the ball off the bat" and Starkovich noted that "she seemed lost back there . . . but we had to hire her [for diversity reasons]."

**Mr. Cooper is Subjected to a Hostile Work Environment**

45.    Things took a turn for the worse for Mr. Cooper on or about June 3, 2023, when Gina transferred to Arizona and began working alongside Mr. Cooper as a full-time umpire.  From her very first day in Arizona, Gina began her campaign of harassment, making sexually suggestive comments, homophobic slurs, and gendered threats against Mr. Cooper.

46.    For example, on her night of arrival, during a gathering in Mr. Cooper's room attended by Kevin Bruno ("Bruno"), Alex Shears, Jonathon Rector ("Rector") and Stone Carver, Gina became belligerent and disturbingly boasted, ***"I can have sex with any of you and nothing would happen," "I can fuck anyone in this hotel," "I'm a woman, I can get away with anything"*** and ***"I'm a female and they will believe me over a male."***

47.    Emboldened by the MLB's unlawful diversity quota, Gina proclaimed, ***"MLB has to hire females [and] they won't get rid of me unless I quit"*** and ***"I'm going to be in the hall of fame as the first female in the MLB."***   In her final aggressive act that evening, Gina set her sights on Mr. Cooper, who was laying in his hotel bed with another umpire, Bruno, watching Netflix, and began calling them both ***"gay"*** and ***"faggots"*** for watching Netflix together.

48.    Unfortunately, June 3, 2023, was just a warm-up for Gina, whose obsession with Mr. Cooper's sexuality and having sex was relentless. Indeed, Gina inappropriately asked Mr. Cooper if he was "still cuddling Bruno," and continued to routinely call him a "faggot."

49.     No place was safe from her attacks, because even at work outings, Gina attempted to humiliate Mr. Cooper in front of complete strangers, telling them that Mr. Cooper and his colleagues, ***"all have small dicks"*** and not to ***"sleep with them because they're all gay for each***

*other."* When Mr. Cooper asked Gina to stop calling him a faggot and reminded her that he is

bisexual and did not want to be outed, she doubled down, and told him to *"stop being a bitch"* and

*"don't be so sensitive."*

50.     Things reached a fever pitch on late July 4th, into the early morning on July 5, 2023.

Mr. Cooper and several other colleagues - - Stone Garver, Michael Cross, and Bruno - - went to

Mr. Cooper's room and accidentally walked in on Gina and his roommate Rector heavily making

out in Mr. Cooper's room. In response, Gina shoved Rector off of the bed and Mr. Cooper

immediately closed the door.

51.     Later, Gina told Mr. Cooper and his colleagues that she planned to accuse Rector

of sexual assault to avoid being disciplined for their fraternization, and that "she could get away

with it" because of her gender.  After Mr. Cooper and his colleagues challenged Gina's plan to

heinously lie about Rector, she became belligerent and blamed Mr. Cooper and his colleagues for

walking in on them and claimed that she could **"fuck anybody in this hotel if I want to."**

52.     Concerned that Mr. Cooper and his colleagues would report her egregious conduct,

Gina threatened that she would "**slit [their] throats and suck [their] blood. . . you're a bunch of**

**faggots**" if they told anyone what had happened that evening.

53.     When verbal threats did not feel sufficient, Gina then became physical with Mr.

Cooper, pushing his chest, and locking him out of his own room.  Once Mr. Cooper gained access

to his room, Gina shoved Mr. Cooper into the wall and told him to "**shut the fuck up**." In an effort

to deescalate the situation, Mr. Cooper asked Gina to stop touching him and to leave his room so

he could go to sleep, which she eventually did.

54.     Concerned by what had occurred, Mr. Cooper and Bruno consulted with some of

the higher-level umpires who instructed them to report the incident, in part, because Rector had

made several suicidal statements that night over concern that he would lose his job as an umpire for making out with Gina.

55.    On or about July 6, 2023, after consulting Mr. Cooper, Cross and Stone, Bruno submitted a written complaint describing the July 4-5 incidents in great detail to Dellinger.  Bruno's report explained in explicit detail how Gina had used incendiary language, such as "Faggot" and repeated rants about being untouchable at the MLB because of her gender.

56.    Later that day, after receiving a call from a union attorney, Gina texted Rector to inform him that she was "done with [Mr. Cooper]" and that she planned "to get rid of him," believing that he had been the one that "snitched" on her.

***Defendants Unlawfully Retaliate and Terminate Mr. Cooper Because of his Gender and Sexual Orientation***

57.    Shockingly, in response to Bruno's complaint to the MLB about Gina's unlawful and deplorable conduct, the MLB informed Mr. Cooper that he would have to under sensitivity training and refused to explain what he had done to warrant such training.

58.    Not understanding why he was being punished for Gina's abhorrent conduct, on or about July 22, 2023, Mr. Cooper called President Jordan Ferrell ("Ferrell") to explore his options and find out why he was being punished.  In response, Ferrell threatened Mr. Cooper that if he asked questions, he would be suspended for three games without pay. Additionally, despite not being the aggressor or wrongdoer in this incident, Mr. Cooper learned that this incident would disturbingly go in his personnel file with the MLB and hurt his chances of promotion down the line.

59.    Then on July 24th, Jordan followed up via text message, making it abundantly clear that the MLB would punish him if he complained, stating, "I spoke to MLB. They are enticing you to not do an interview and ask them questions."

60.     Shortly after receiving this text message, Mr. Cooper received an email from the MLB stating that he was being accused (and not Gina) of violating the Anti-Discrimination and Harassment Policy for Minor Leagues ("Policy").

61.     Mr. Cooper subsequently met with Billy Bean ("Bean"), from Human Resources, who interviewed Mr. Cooper to determine if he had indeed violated the Policy.  Bean explained that when he was in the process of interviewing Gina, she had accused Mr. Cooper of being a "mean person" and that she had been victimized as the sole female umpire working in Arizona.

62.     Mr. Cooper pointed out that this was blatantly false given that there were two other women working as umpires alongside Gina in Arizona.  Mr. Cooper then complained to Bean of Gina's egregious homophobic conduct and weaponizing her gender - - despite Jordan's warnings - - and disclosed that there were multiple videos taken by Stone, Cross and Mr. Cooper of the Gina's conduct, in fear that Gina had put her hands on Mr. Cooper twice and had threatened all the men that she was untouchable. Mr. Cooper further told Bean that he was concerned that his assertions that Gina had gotten physical with him were not being taken seriously by Human Resources or the MLB.  In response, Bean brushed Mr. Cooper's concerns off and informed Mr. Cooper that he wanted the situation to be a "learning experience ***for everyone***" and that he would further investigate the issue and provide him with an update thereafter.

63.     Despite providing witnesses and informing him that he and others had documentation, Bean never requested Mr. Cooper's documentation and failed to interview any of Mr. Cooper's witnesses or collect their documentation of Gina's conduct.  Instead, when informed that there was video documentation, that Gina had threatened to get Mr. Cooper terminated, and that Gina believed she was untouchable because of her gender, Bean simply instructed Mr. Cooper to hold onto to his video recordings.

64.     Instead of thoroughly investigating Mr. Cooper's allegations of discrimination, Defendants set their sights on getting rid of Mr. Cooper and stopped evaluating his performance and excluded him from the playoffs, clearly to lay the groundwork for ousting him from the MLB. Indeed, Mr. Cooper was entitled to at least four (4) evaluations during his season, by at least two different evaluators. For the one evaluation that Mr. Cooper did have in June 2023, he received very high marks, and received, "met", "above" or "superior" in each category.

65.     In a final act of discrimination and retaliation, in a phone call with Dellinger and Spagnardi that lasted less than a minute, Defendants terminated Mr. Cooper from his contract without explanation, ending his promising career as an umpire in the League in early October 2023.

66.     The MLB's termination of Mr. Cooper was clearly a further act of its unlawful gender diversity quota and illegal retaliation, and in no way legitimate, given Mr. Cooper's high-performance ratings.

67.     Of note, Mr. Cooper was the sole first year umpire fired out of the twenty-six original umpires hired in Mr. Cooper's cohort. To date, Gina is still employed with the MLB.

**Mr. Cooper Would have Worked In New York had he not been Unlawfully Terminated and Promoted up the Ranks**

68.     Moreover, the League's wrongful termination effectively robbed Mr. Cooper of a promotion to other levels thereby robbing Mr. Cooper of the opportunity to work in the Minor and Major Leagues officiating games in New York State and New York City.

69.     For example, the following umpires that Mr. Cooper work with on a crew: Jamal Allen, Brandon Spevak, Jon Forester, Jarred Neal, Stone Garver, Ian Durkin, Alex Shears, Kevin Bruno, and Theo Ardnt, all - - except for Kevin Bruno who worked in 2023 - - worked in New York in 2024 after Mr. Cooper's termination. Thus, eight out of the ten umpires that Mr. Cooper

worked with on a crew in the Arizona League worked in New York after Mr. Cooper's termination

and six out of eight that had started on the Taxi Squad with Mr. Cooper, also worked in New York

five of whom did so after Mr. Cooper's termination.

70.    Thus, had Defendants not unlawfully terminated Mr. Cooper, effectively denying

him a promotion to the next level, Mr. Cooper would have worked in New York and New York

City as a Minor League umpire.

71.    Moreover, Defendants' unlawful conduct further denied Mr. Cooper his dream of

becoming a Major League Umpire and earning a substantial income throughout his career. As a

result of Defendants' unlawful actions, Mr. Cooper's dream of becoming a Major League umpire

has been permanently derailed.[4]

### Plaintiff Alexander Lawrie

### Mr. Lawrie had a Promising Career as an MLB Umpire

72.    Mr. Lawrie was hired as a Gulf Coast Minor League Umpire in 2019. Mr. Lawrie

was the first MiLB Umpire hired from Nova Scotia, Canada in 17 years.[5]

73.    During 2019, Mr. Lawrie was given largely positive reviews of his performance

from four different evaluators across five different evaluations, and it was noted that he excelled

at Judgement on the Field.

74.    In 2020, Mr. Lawrie was promoted up a level to work in the New York-Penn

League, which included the following New York and New York City teams: Brooklyn Cyclones,

---

[4] The MLB's derailment of Mr. Cooper's promising career has not only robbed him of career fulfillment, but also an earning potential of between $150,000.00 to up to $500,000.00, as well as per diem pay, free hotels, and first class airfare.
*See* https://www.sportingnews.com/us/mlb/news/world-series-umpire-salaries-mlb-2023 games/25a8f1990592469f3333313e#:~:text=According%20to%20Career%20Trend%2C%20MLB,year% 2C%20depending%20on%20their%20seniority ( last visited April 17, 2024).
[5] See https://www.saltwire.com/nova-scotia/news/road-to-big-leagues-a-long-one-for-mineville-umpire-304424/ (last visited July 24, 2024).

Hudson Valley Renegades, and Staten Island Yankees.  Mr. Lawrie would have worked in New York during this assignment, but because of COVID, the season was postponed and eventually cancelled.

75.    Due to restructuring of the minor leagues and the COVID-19 Pandemic he, and many others, were sent back to rookie ball for the 2021 season.

76.    In 2022, because of his talent, Mr. Lawrie was once again promoted into the restructured Single-A League where he remained for the 2022 and 2023 seasons.

77.    During the 2022 Spring Training, Mr. Lawrie received all positive reviews. In 2023, Mr. Lawrie was not reviewed because his camp only received two or three supervisions, instead of the more standard six to eight supervisions of years past.

78.    In 2023, Mr. Lawrie was among the eight umpires from his league who were selected to work in the playoffs, an accomplishment, as not everyone from his league was chosen to work these games. Notably, every other umpire in his league who worked in the playoffs is still employed, as is one of the two umpires who was not selected to work the playoffs.

79.    During the 2024 Spring Training, Mr. Lawrie once again was told he met or exceeded expectations in his reviews. Moreover, Mr. Lawrie had been further honing his skills, as demonstrated in his second review, which noted that he showed marked improvement in the areas that were previously reviewed as "met expectations."

**Gina Sexually Assaults Mr. Lawrie During the 2024 Spring Training**

80.    With only two days into the 2024 Spring Training, on March 17th, things took a turn for the worse for Mr. Lawrie after the yearly charity bowling tournament hosted by "Umps Care" had taken place.

81.     Mr. Lawrie and Gina were both bowling for different teams at this event. Afterwards, many of the tournament participants, including Mr. Lawrie and Gina, left for a bar in Sarasota, Florida.

82.     Prior to this event, Gina had told her roommate Tanya Millette ("Ms. Millette") - - a former police officer - - that she had found one of their male coworkers "really cute and attractive." However, it was not clear which of their coworkers she was referring to, as over the course of the evening Gina had groped more than one male umpire, including Jarred Neal, who Gina told Ms. Millette that she "thought he was gay" when he walked away from her after she grabbed his buttocks.

83.     At the end of the night Ms. Millette, Mr. Lawrie, and Connor Crowell ("Mr. Crowell") were carpooling back to the hotel and Gina requested to carpool with them, and they agreed to give her a ride. Ms. Millette was driving, and, unfortunately, Mr. Lawrie ended up in the back seat with Gina.

84.     When pulling into the parking lot of the hotel, Tanya made a gentle turn off Tampa Road and onto St. Petersburg Drive East. Using this turn as cover, Gina pushed herself onto Mr. Lawrie and grabbed his genitals. In shock Mr. Lawrie told her to "get off of me," and when that didn't work, Mr. Lawrie exclaimed, "Gina get the fuck off me!" At that point, Gina finally slid back to her seat. Both Ms. Millette and Mr. Crowell were too surprised to react until the car was parked at the hotel, although they both looked up in the rearview mirror and Mr. Crowell turned around to witness the assault.

85.     Upon arriving at the hotel, Mr. Crowell stayed with Mr. Lawrie who was visibly shaken a half hour after the incident and Gina left to go back to her room.  When Gina returned to her room, she called Mr. Lawrie, but he did not pick up the phone.

86.     Then, next morning Mr. Lawrie received a voicemail from Gina in which she stated, "it's come to my attention that am I may have done something to offend you. Um that was inappropriate, and I just wanted to reach out and say I'm truly sorry. . . I'm very embarrassed [] sad, and I'm truly concerned it was inappropriate behavior."

87.     Mr. Lawrie did not call her back and avoided Gina during his remaining time at the 2024 Spring Training.

## Mr. Lawrie Complained to the Umpire Union about Gina's Sexual Assault

88.     On or about March 20, 2024, while at a Union meeting, Mr. Lawrie approached the Second Vice President, Clay Williams ("Mr. Williams") of the Umpire Union and complained to him about Gina's sexual assault. Not wanting to deal with Mr. Lawrie's complaint, Mr. William told Mr. Lawrie that he needed to escalate it to the President of the union, Jordan Ferrell ("Mr. Ferrell").

89.     Mr. Lawrie did just that and complained to Mr. Ferrell about Gina's sexual assault. However, Mr. Ferrell made it clear that while the ball was in Mr. Lawrie's court, he threatened Mr. Lawrie that if the MLB Human Resources were to get involved and take disciplinary action against Gina, the Union would need to defend her as the Union is required to defend any member against an accusation or disciplinary action.

90.     The President also threatened Mr. Lawrie that the Union and the MLB would most likely side with Gina, just as they had the year prior when handling Brandon Cooper's allegations against Gina, implying that Mr. Lawrie would be terminated unless he kept his mouth shut.

## Defendants Wrongfully Terminated Mr. Lawrie

91.     On April 1, 2024, *less than two weeks* after complaining to the Union about Gina's sexual assault, the MLB terminated Mr. Lawrie in retaliation citing inexplicable "performance

issues" as pretext for the termination. Indeed, the MLB's rationale was in stark contrast to the high marks Mr. Lawrie had consistently received in his previous performance evaluations.

92.     Defendants' discriminatory and retaliatory termination robbed Mr. Lawrie of continuing to work up the levels in the Minor Leagues and an opportunity to advance to the Major Leagues.  Had Defendants not unlawfully terminated Mr. Lawrie, Mr. Lawrie would have continued to be promoted as a Minor League Umpire working his way up the levels to eventually becoming a Major League umpire and would have earned substantial income throughout his career. Likewise, Defendants unlawful conduct deprived Mr. Lawrie of working in New York and New York City as a Minor and Major League umpire. As a result of Defendants' unlawful actions, Mr. Lawrie's dream of becoming a Major League umpire has been permanently derailed.

<u>**FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS**</u>
**(Hostile Work Environment Because of Gender and
Sexual Orientation in Violation of the NYSHRL)**

93.     Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

94.     The NYSHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's sex, gender and/or sexual orientation.

95.     As described above, Plaintiffs were subjected to a hostile work environment because of their gender or sexual orientation.

96.     As a direct and proximate result of Defendants' conduct in violation of the NYSHRL Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

**SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS**
**(Wrongful termination, Failure to Promote and/or Retaliation in Violation of the NYSHRL)**

97.    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

98.    The NYSHRL protects nonresidents who proactively seek a New York based job opportunity.

99.    The NYSHRL prohibits employers from terminating employees because of their gender and sexual orientation.

100.    The NYSHRL prohibits employers from retaliating against employees who engage in activity protected by the NSYHRL.

101.    As described above, Defendants unlawfully terminated Plaintiffs because of their gender or sexual orientation in violation of the NYSHRL.

102.    As set forth above, Plaintiffs were employees who engaged in activity protected under the NYSHRL, while Defendants are employers within the meaning of the NYSHRL.

103.    After Plaintiffs engaged in activity protected under the NYSHRL, Defendants retaliated against Plaintiffs as also described above.

104.    As described above, Defendants unlawfully failed to promote Plaintiffs because of their gender or sexual orientation and/or in retaliation for engaging in a protected activity, thereby depriving Plaintiffs of the opportunity to work in New York.

105.    As a direct and proximate result of Defendants' unlawful termination and/or retaliatory conduct in violation of the NYSHRL, Plaintiffs have suffered economic loss, and continues to suffer, for which they are entitled to an award of monetary damages.

106.    As a direct and proximate result of Defendants' conduct in violation of the NYSHRL, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

## THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
### (Hostile Work Environment Because of Gender and Sexual Orientation in Violation of the NYCHRL)

107.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

108.    The NYCHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's sex, gender and/or sexual orientation.

109.    As described above, Plaintiffs were subjected to a hostile work environment because of their gender or sexual orientation.

110.    As a direct and proximate result of Defendants' conduct in violation of the NYCHRL Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### (Wrongful Termination and/or Retaliation in Violation of the NYCHRL)

111.    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

112.    The NYCHRL protects nonresidents who proactively seek a New York City based job opportunity.

113.    The NYCHRL prohibits employers from terminating employees because of their gender and sexual orientation.

114.    The NYCHRL prohibits employers from retaliating against employees who engage in activity protected by the NYCHRL.

115.    As described above, Defendants unlawfully terminated Plaintiffs because of their gender or sexual orientation in violation of the NYCHRL.

116.    As set forth above, Plaintiffs were employees who engaged in activity protected under the NYCHRL, while Defendants are employers within the meaning of the NYCHRL.

117.    After Plaintiffs engaged in activity protected under the NYCHRL, Defendants retaliated against Plaintiffs as also described above.

118.    As described above, Defendants unlawfully failed to promote Plaintiffs because of their gender or sexual orientation and/or in retaliation for engaging in a protected activity, thereby depriving Plaintiffs of the opportunity to work in New York City.

119.    As a direct and proximate result of Defendants' unlawful termination and/or retaliatory conduct in violation of the NYCHRL, Plaintiffs have suffered economic loss, and continue to suffer, for which they entitled to an award of monetary damages.

120.    As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

## FIFTH CLAIM FOR RELIEF AGAINST THE DEFENDANTS
### (Violation of Title VII)

121.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

122.    Title VII prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's sex, gender and/or sexual orientation.

123.    As described above, Plaintiffs were subjected to a hostile work environment because of their gender or sexual orientation.

124.    Further, Title VII prohibits an employer from retaliating against an employee for engaging in protected activity in the form of a complaint regarding illegal behavior.

125.    As described above, Defendants engaged in unlawful conduct when they terminated Plaintiffs after engaging in protected activity by complaining about the harassment and discrimination they faced while employed by Defendants.

126.    Defendants' conduct included requiring Mr. Cooper to be subjected to Gina's sexual harassment and verbal abuse and condoning Gina's sexual assault of Mr. Lawrie.

127.    As a direct and proximate result of Defendants' discriminatory conduct in violation of Title VII, Plaintiffs have suffered, and continue to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## DEMAND FOR A JURY TRIAL

128.    Pursuant to FRCP 38(b), Plaintiff demands a trial by jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

a.      A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned New York State laws;

b.      Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c.      An order restraining Defendants from any retaliation against Plaintiffs or witnesses for participating in this lawsuit in any form;

d.      Granting an award of damages in an amount to be determined at trial to compensate Plaintiffs for all monetary and/or economic damages in connection with their claims, whether legal or equitable in nature, including back pay, reinstatement or front pay, and any other damages for lost compensation or employee benefits that he would have received but for Defendants' unlawful conduct;

e.      Granting an award of damages to be determined at trial to compensate Plaintiffs for emotional distress and/or mental anguish in connection with their claims;

f.      Granting an award of damages to be determined at trial to compensate Plaintiffs for harm to their professional and personal reputations and loss of career fulfillment in connection with their claims;

g.      Granting an award of punitive damages, to the extent permitted by law, commensurate with Defendants' ability to pay;

h.       Granting an award of reasonable attorneys' fees, as well as all costs and disbursements incurred in connection with this action, including expert witness fees and other costs;

i.       Granting an award of pre-judgment and post-judgment interest, as provided by law; and;

j.       Granting such other and further relief as this Court deems just and proper.

Dated:  New York, New York
October 7, 2024

Respectfully submitted,

**JOSEPH & NORINSBERG, LLC**

By:       _____

JON L. NORINSBERG, ESQ. (JN 2133)
BENNITTA L. JOSEPH, ESQ. (BJ 1064)
CAITLIN DUFFY, ESQ. (CD 8160)
110 East 59th Street, Suite 2300
New York, New York 10022
Tel.: (212) 227-5700
Fax: (212) 656-1889
*Attorneys for Plaintiff*